Good morning, Your Honors. May it please the Court, Robert Foster, Supervising Deputy Attorney General for Respondent. I want to thank the Court for allowing us to file these supplemental materials. I want to apologize to the Court for the material misstatements of facts in the appellant's opening brief. I didn't create them. When this case was assigned to me, we discovered them, and within three days of that, we had filed the request to clarify the record. Those mistakes should not have happened, and I apologize to the Court. As to the issues we face today, it is our position that the District Court, both the Magistrate Judge and the District Court Judge, use the wrong standard in evaluating the evidentiary issue in this case. True, the Magistrate Judge's opinion pays lip service to AEDPA, but then when you look at how the Magistrate Judge and the District Judge applied it, they make the mistake of, they have to find an unreasonable application. They don't do that. The analysis is simply taking the State Court analysis, evaluating it, and saying it's erroneous. Well, the United States Supreme Court told us in Bell v. Cohn, an unreasonable application is different from an incorrect one. There was no deference given by the District Court in this case. If you look at the analysis on Statements 1 through 7, again and again and again, he says, California Court of Appeals is wrong. California Court of Appeals is wrong. There is no deference given. There is no deference allowed. There was no analysis at all by the State Court, right? No, there was as to four of the statements, Your Honor. What happened was the District Court opinion disagreed. Did you hear my question? Yes, sir. What was my question? Was there any analysis done by the State Court of Appeals? I don't think you have my question. As to some of those statements, there was no analysis by the State Court. That is correct. Always listen to the question. I thought I had, Your Honor. I apologize. What do we do with those, the ones that we have no State Court analysis? I think it doesn't matter, Your Honor, because the State Court of Appeals I think it matters because I asked the question. Yes. You know, just so that- I don't think it makes a- You spread disbelief. I don't think it makes a difference in the outcome, Your Honor, because- You could ask the question just one more time. If you choose not to answer it- I'm trying to, Your Honor. We move on to the next question, okay? And I'll just simply not have the benefit of you thinking on it. What do we do with regard to the statements where the state court did not do an analysis? I think under the- What standard do I apply there? I think under the AEDPA, you still look to whether or not the state trial court's decision to admit the evidence was proper. Is that decision entitled to deference? So instead of looking at the intermediate California appellate court, you look at the action of the trial court. And I think- And what deference do we owe there? I beg your pardon, Your Honor? What deference? What standard do we apply there? I think it's still deference, Your Honor. The question under AEDPA is, was the decision of the California court entitled to deference? I don't think it matters whether it's the trial court decision or the intermediate appellate court decision. You still have to use the deference analysis. So even though we don't know what the rationale of the state court is, we have to apply the unreasonable standard. This is unreasonable. Yes, Your Honor. Even though we don't know what it was thinking. Well, I think you do know what it was thinking when it made its rulings on those evidentiary questions in the trial court, Your Honor. I thought- We apply the thinking as to some statements to other statements. So we don't know why the state court did what it did. I'm just sort of wondering how you apply this unreasonable standard when you don't know. I think you do know, Your Honor, because at the time the trial court made its rulings, it ruled that they were admissible as hearsay exceptions under the co-conspirator exception. I don't know what more you would need from them. Are you talking about the rationale under the theory it was working on? If that's what you're talking about, sometimes we have that, sometimes we don't. But as this Court said in a case called Franklin v. Johnson, it doesn't matter what the state rationale was, you have to look at the ultimate decision to admit the evidence. And the question is, was that decision correct, even if the underlying theory was incorrect? That's 295-3-1223 at 1233. The question is, was this evidence properly admitted? Is it entitled to deference? And I think that's the problem with the analysis by the district court, is it never acknowledged deference, but it confused being deference and simply being erroneous. And you have to show more than that. I think as we made clear in the brief, these statements are admissible under the co-conspirator exception. I mean, in the supplemental brief, we pointed out that the majority of these statements are also admissible under California law as declarations against penal interest. Now, counsel cites the Lolly case from the California Supreme Court. But if you read that case carefully, it involved a solicitation to commit murder. So the statements the additional statements in that case, that crime has an element of conspiracy within it. And as a result, the court said, well, the statements that the prosecution was trying to get in had an element of conspiracy in it, and it didn't, therefore it wasn't specifically deserving to the interest of the declarant. But that's not true here, because in this case, there was a charge of manufacturing methamphetamine. Every single statement you go through that Martinez made was a declaration against penal interest. She said, I'm going to let them use my garage to make the methamphetamine. I'm going to watch how they do it. She comes back and says, I just helped them get the stuff to make the methamphetamine. Every single one of those statements is a declaration against penal interest and is admissible. And, Your Honor. Where does the residual exception of the confrontation clause play here, if at all? Well, I don't think it does, Your Honor, because in the post-Lilley case cited in the briefing, this Court has held that statement made by an individual to a non-peace officer is an exception and is reliable. That the Lilley was concerned with, he made it to the police, and I don't have it at my fingertips. I can, if I may, Your Honor. I think we're talking about, it's in Boone, Your Honor, 229-Fed 3rd, 1232-1234, where this Court said if the statement in question is made by an individual to another individual, a non-peace officer, it's different. So I think that in this case, when you take a look at the declaration against penal interest analysis, it's clear these statements were admissible. I would reserve any additional time, if I may, for rebuttal, please. Good morning, Your Honors. I'm Philip Brooks, appearing for Mr. Day. We have sort of two areas to discuss this morning. There's the area of the against penal interest exception and whether that's properly here before the Court, and then, of course, there's the other question about whether the statements here are in furtherance. If the Court has any indication for me which it would like me to address first. I'd like to know whether the magistrate judge used the wrong standard on page 25 of the report and recommendation. The magistrate judge says the issue before the Court is not simply whether Charlene's statutory exception to the hearsay rule. Rather, under the AEDPA, the Court must determine whether the Court of Appeal clearly erred in finding Charlene's statements to Peggy were made, of course, in furtherance of the conspiracy. Is a clear error the wrong standard to apply? Well, I think that, and maybe it was in Lockyer v. Andrade, the Court clarified. I think they looked at that language and said that that wasn't the best language to use to describe the standard. That's right. I mean, it's the wrong standard. Yeah, but on the other hand, I think that whether there's a clear error and how unreasonable it is to make that error has got to still be part of the evaluation. Well, I mean, we used the clear error standard in Vantrain, and I think that's the wrong. Isn't this grounds alone to reverse it and send it back for reconsideration? Back to the district court? Yes. Well, I guess that's certainly a possible alternative. But I think that it would maybe be the wrong alternative choice if this Court believes that under the standard, the way it's worded now from the U.S. Supreme Court, that the district court came to the correct conclusion. And that's our position, that the Court did. In fact, we can probably do it either way. Whether we think it's the correct conclusion or the wrong conclusion, it's a matter of law. We just apply the standard. There's no point in sending it back, is there? That would be true, I would think. I think that's correct. It works both ways. Mm-hmm. I mean, there's no evidence or anything else, no particular expertise on the part of the magistrate judge on these issues. Right. So why do you think these state courts were manifestly unreasonable in concluding that at least some of these cases were infernal? Well, I think that we have to take into account the relationship between Charlene and Peggy that question. And everybody pretty much has agreed that their relationship was they were close friends, that Peggy was a confidant of Charlene, and that that's what their relationship was. And it seems to me that with regard to the first statement, the way they're enumerated, statement one was Charlene said they wanted a ride to buy many things. Now, it's our position the Court of Appeals' decision was clearly unreasonable on that because it didn't really address the question of how Charlene telling Peggy this would further the interests of the conspiracy. There's really the court just said arranging to get many things, that's an ingredient of the myth. And so that's the fact that he's making that arrangement, or that the co-conspirators are making that arrangement, furthers the conspiracy. But that seems to me is not the question. The Court of Appeal relied on that for its decision, but the real question was how did Charlene telling Peggy that advance the interests of the conspiracy? I think the answer is clearly it didn't. And so in sort of addressing the wrong question, we think that the Court of Appeal was unreasonable. Were these declarations against penal interest? I think that under California law, what we would find if a California court ruled on it would be that a portion where Charlene implicated herself would be against her penal interest, but another portion of her statement in which she implicated someone else would not be against her penal interest. It's not against Charlene's penal interest to say somebody else did it. And what the California courts do with these statements, as they did in Leach, as they did in other cases I've cited, is that they excise the portions that implicate other people. That's California evidence law. That's right. As a matter of constitutional law, if they were to come in, or if they qualify as declarations against penal interest, not as a matter of California law, but just in general, wouldn't that solve the confrontation problem, which is what we have to worry about? Well, I think that that's putting the cart before the horse, Your Honor, frankly. I think that first it has to be shown that they come within an exception to the hearsay rule under California law, because otherwise they won't come into evidence. Okay. As to the two statements that the California Court of Appeals did not address out of the seven, it's our position that that was an unreasonable decision on the part of the Court of Appeal in failing to address them. And then if we do go back to what the trial court said about the statements, it's our position that what the trial court said about those statements was unreasonable because in the context of things, it's clear that it's just a conversation. It's a mere narrative, just relating events. And Charlene is not trying to advance the interest of the conspiracy in making those statements to Peggy Evans. I think we have to take into account that people talk to other people for various kinds of reasons, you know, and I think it's recognized that men are different from women in this respect, that if a man has a problem, he goes off and thinks about it for a while and makes up his mind. If a woman has a problem, what she wants to do is to talk to somebody about it. And they just talk and talk and talk. And that's what these two women were doing here. And I don't think that Charlene expected Peggy to solve any of the problems that she was bringing up or to participate in any of the deals that she was describing. She's just talking to her girlfriend's girlfriend, and that's what's going on here. It's not a question of Charlene trying to induce Peggy to come and help in the cook or anything like that. And so it's unreasonable for the court of appeal to conclude that that kind of a narrative furthers the conspiracy. There's really no evidence in the record at all that Charlene expected Peggy to come and help in this cook. You know, I mean, the attorney general has made much of the statement where Peggy says we were cleaning the house and Charlene was in a hurry and she wanted to hurry up and get out of there. And she said it was because she had to go and meet Day. Now, the question is, is it reasonable in light of the whole record to find that that's a statement in furtherance? And what we see when we look at the whole record is where did they go after they finished cleaning the house? Charlene says, let's go to the thrift store. And so they go and they spend time shopping at the thrift store. And, you know, they're there for a half an hour. They're there for 40 minutes. And now you have to try and call again over to leave a message for day over at the garage. But was you know, does the record show that Charlene was in a hurry to get over to the cook? I don't think so. What the record shows is that she wanted to get done because she was in a hurry to get done with the job they were doing because she wanted to go shopping. That's the I'm sorry. What does it seem to say that Martinez want to finish in a hurry? She could get to the cook. But I'm wondering where they got that. What is the actual statement? The actual statement from Charlene is that. Let's see, where did I have that quoted? My best doing it by memory. My best recollection is that she said Charlene was in a hurry and she wanted to hurry up and finish up and get out of there. And then at the 402 hearing, I think the people in their reply brief. I mentioned that at the at the 402 hearing in the trial court that she may have phrased it slightly differently. But it seems to me the fact that she wanted she was in a hurry is one thing, you know. And but the statement itself doesn't refer to the cook. That's right. That's correct. That's correct. There's nothing but the statement that explains why she's in a hurry. That's correct. So where did the state court get this idea that she's in a hurry because she wants to get to the cook? I think that was relating to different statements that that Charlene had made to Peggy. And at one at one time, Charlene had said, I'm going to go and meet today and do this cook. And then at another time, she said, let's hurry up. I have to hurry up and finish up cleaning. They were actually separate statements. I mean, she might have been for some other reason. That's right. And then at the same time, when she merely relates to Peggy Evans, that she's going to meet day at the garage to do the cook. That is that statement is not being done to further the interest of the conspiracy because Peggy has nothing to do with the cook. Peggy is just her friend that she's talking to. She's not Charlene's not advancing the interest or furthering the interest of the conspiracy. OK, time's up. All right. Thank you very much. All seven of them, Your Honor. Well, I don't see where any of them. Well, even even assuming that that's true, Your Honor, the earlier declarations against penal interest and would come in under that exception. I keep asking questions and other questions. If you want to say that's right, they don't. And let's talk about penal interest. That's fine. But if you don't, if you don't give me any help on this, if on behalf of the state of California, you want to give up on this issue. If you don't want to give up on this issue, then answer my question. Yes, Your Honor. I think as to the first one, it indicates the point that they're going to pick up the many things and necessary prerequisite to making the methamphetamine. As to number two, she says we've done it. I mean, it seems to me that she's explained her participation. It is intertwined of the conspiracy. Is the first statement. What exactly is the first statement? It's an excerpt of the record. Forty five and forty six, Your Honor. They're cleaning. And they call. And Martinez says they want to her to drive him to Redlands store to order the many things. Martinez asked Evans to go with her and day to pick up some of the many things. And Evans says she goes with them and they put in the order from the tablets. That's it. RT 579. Quotes and quotes. I think what is the statement? The actual words, Your Honor.  What is the statement? I do not have the exact word, Your Honor. I have the statement that's in the excerpt that the record of forty five and forty six. What line? An excerpt of the record. Forty five. Statement one line 17. Peggy testified that Charlene told her the petitioner had asked her to drive him to the Redlands store to place an order for some many things. So Peggy testified that Charlene told her the petitioner had asked her to drive him to the Redlands area to place an order. This is the three levels of hearsay, right? Two or three. Yes, Your Honor. And where is that? Where is the conspiracy? Peggy is Evans, right? Yes, Your Honor. Charlene is Martinez. Yes, Your Honor. And petitioner is? Day. Day. So is it Charlene's statement to Peggy or petitioner's statement to Charlene? Which is the statement that is advancing the conspiracy?  Let's take it one at a time. How does Charlene telling Peggy what petitioner asked her to do advance the conspiracy? I think, and as the California Court of Appeal indicated, she wanted someone to be there as a safety valve if something went wrong to help out. She's explaining to her the plan. She is trying to get her best friend, her confidant, to be available if something goes wrong. I think she's explaining what the plan is so that if need be. I don't see anything about this saying, come with me. I mean, you're pointing me to the statement. This statement does not say, Ann, come with me. It doesn't say, I wish you'd come with me because. I think. It doesn't say, Dan asked me to go there. I don't want to go by myself. Come with me. There's nothing about this statement as you. That's correct, Your Honor. But I had also cited 579 through 582 of the reporter's transcript, which was lodged with the district court, which has that information. Well, I asked you what the statement was, and you gave me this. Yes, Your Honor. Okay. I don't have the exact words in front of me, Your Honor. I'm trying to give you the best source I have today. You didn't bring it with you? No, Your Honor. The transcripts are this long. So? I didn't bring them, Your Honor. I'm trying to give you the best I can. If you'd like me to submit a supplemental or a brief quoting the exact words. I really don't care. You're representing the state of California. You don't have to admit anything. If you, but this is what we're talking about. Yes, Your Honor. This is what this case is about. You don't come to court without them. I came to court. There's something else here other than this description? As we cited to, 579 to 582 of the record, Your Honor. And it says what? It says that she asked if Evans wanted to go with them, and she did. She stayed in the car while they went into the store. And this was the same statement? Yes, Your Honor. As here where it says? That's my understanding, yes, Your Honor. In closing, Your Honor, unless there are other questions, it seems to me that counsel here today made the same mistake that the district court made. He keeps talking about this is unreasonable. It isn't whether the logic of the district court, the state court of appeals decision was illogical. It's whether it was an unreasonable application of clearly established Supreme Court authority. They haven't shown that. If it is illogical, then it winds up being an unreasonable application, doesn't it? No, I don't think they're the same at all, Your Honor. As I quoted you earlier on Bell v. Cohn, incorrect is not unreasonable. All right. We weren't talking about correct, we were talking about illogical. I don't think simply because it's illogical it's unreasonable, Your Honor. I'm glad to hear you don't think so. Thank you, Your Honor.
judges: Kozinski, O'scannlain, Silverman